the plaintiff's own account. Plaintiff was forced to travel to New York City to access her funds at a Chase branch where she maintained a fifteen-year banking relationship at that time.

132.    The same conduct had previously occurred at a Navy Federal branch located in Columbia, Maryland.

133.    **TAKE Notice**: The detailed documented evidential material is held by the financial institutions and will be solicited during the discovery hearing and or Court ordered production.

134.    These acts were carried out through instrumentalities of interstate and foreign commerce, and constituted a continuous pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). These acts are shocking to the plaintiffs' sense of fairness, thus constituting an abuse of process, and authority as a matter of law.

135.    As a direct and proximate result of defendants' violations of § 1962(c)), plaintiff suffered injury to her "business or property," including but not limited to:  constructive discharge into early after 17 years of honorable service 3 years before scheduled retirement, out-of-pocket costs for relocation, security, and mitigation, financial and reputational damage interfering with prospective employment, emotional distress, loss of administrative licensing and monetary benefits.

136.    As a result, the defendants actions which were in direct violation of 18 U.S.C  1344 bank fraud, New York General Business Laws  § 349, N.C General Stat 75-1.1 and 42 U.S.C § 1983.

## TITLE III - ELECTRONIC COMMUNICATIONS
## PRIVACY ACT (ECPA) 18 USC 2510 et seq. CLAIMS

**Take Notice:** "Plaintiff is a seventeen (17)-year veteran of the New York City Police Department with knowledge and operational experience in law-enforcement procedures and tactics."

### Incident on or about January 2019 - 2025: Wiretapping Act

137.    Plaintiff has experienced persistent and unexplained interference with her communications devices, including but not limited to:  delays, echoing, and static during calls placed from her cellular and home phones, devices becoming excessively hot to the touch during minimal use, severe battery drainage and frequent malfunctions, despite multiple device replacements, audible interruptions during calls, including laughter and whispered remarks by unknown individuals, emails, video recording: specific to incidents with the defendant(s) have surreptitiously have been removed from plaintiffs cellphone.

138.    **TAKE Notice:** Defendants have continually and unlawfully accessed privileged and confidential information for their own benefit, using such access to conceal, cover up, and hinder the exposure of their misconduct.

### Incident on or about January 2019 - 2025: Pen Registration and Trace Act Statue

139.    From on or about January 2019 through 2025, Defendants Doe(s) surreptitiously tracked and pinpointed the exact location of plaintiff and her vehicle in real time. This real-time tracking facilitated the coordinated deployment of surveilling vehicles to converge upon and surround plaintiff's vehicle whenever she was in public commerce or engaged in interstate travel.

**Incident on or about February 2022 - April 14, 2022: Stored Communication Act**
**TAKE notice:** Monique Lovell is the plaintiff neighbor in Charlotte N.C.
140.    On or about February 2022, Defendant Monique Lovell befriended plaintiff under false pretenses, presenting herself as a potential friend and neighbor who resides within the same residential community as plaintiff.

141.    On or about April 13, 2022, under the guise of wishing to speak privately about a "personal matter," defendant Lovell invited plaintiff to a sports bar known as *Nik & Mike's*. During this meeting, defendant Lovell engaged in a line of questioning designed to elicit private and sensitive information, including detailed inquiries regarding plaintiff's employment with the NYPD and specific questions concerning plaintiff's sleeping arrangements within her home, such as the precise room occupied during sleep and bedtime.

142.    Between approximately 1:00 a.m. and 2:00 a.m. on April 14, 2022, during the period when plaintiff was sound asleep in her home, the SD cards were unlawfully removed from plaintiff's home security cameras operated by CPI Security. These SD cards served as a physical backup of recorded surveillance data as the cloud and app had been surreptitiously removed.

143.    Additionally, between March 24, 2022, and April 1, 2022, while plaintiff was traveling from Charlotte, NC to New York City, plaintiff returned to her residence and discovered her back door ajar. Upon reviewing her security system, plaintiff determined that all video footage covering the period of her absence had been deleted from both the primary system and its cloud-based backup. The removal of the SD cards and deletion of cloud-stored video footage effectively destroyed material evidence of unlawful entry and trespass.

144.    Plaintiff duly reported the matter to the Charlotte-Mecklenburg Police Department; however, due to the absence of visible property damage or missing items, and the destruction of surveillance evidence, the matter was recorded solely as a "back door disturbance," and no further investigation was conducted.

**Incident on or about September 25, 2022:  Stored Communications Act**
145.    On September 25, 2022, Plaintiff departed her residence in Charlotte, North Carolina, to travel to New York City. On September 27, 2022, plaintiff received a notification through her home security application that the system had been disarmed from within the home without her authorization. Due to her location in New York, plaintiff was connected by a New York City 911 operator to the Charlotte-Mecklenburg Police Department ("CMPD") to dispatch officers to her residence.The only video footage available from the incident depicted the responding officers' arrival; no footage of the unauthorized entry was recorded or preserved.

146.    **TAKE Notice**: "Notably, on each occasion that plaintiff departs her residence for extended travel, simultaneously all cameras go offline. The outage evidences a coordinated interference with plaintiff's security equipment and constitutes intentional tampering and spoliation risk."

147.    "Pursuant to Fed. R. Civ. P. 26 and 34, plaintiff will produce responsive materials within her possession, custody, or control concerning her home-security systems. Pursuant to Rule 45, plaintiff will subpoena her current and former home-security providers for their business records relevant to the claims and defenses."

**Incident on or about June 16, 2023: Stored Communication Act**
148.    On June 16, 2023, plaintiff departed her residence for New Orleans, returning on June 20, 2023. On June 17, 2023, while plaintiff was away, the home alarm system was armed and disarmed using the correct security code, despite no one having authorized access to her home in her absence. Plaintiff contacted ADT Security Services to request a detailed event history; ADT technician Raven Dock emailed plaintiff a record of activities occurring on June 17, 2023. Upon returning home on June 20, 2023, plaintiff detected a strong and overwhelming odor of fresh paint inside her residence. Plaintiff reported this incident to CMPD.

149.    Additionally plaintiff's home Wi-Fi network has been repeatedly compromised by a device identified as "Resideo Home Security," with which plaintiff has no affiliation and for which she has not granted access. The unauthorized "Resideo Home Security" device continues to reappear on plaintiff's network despite changing passwords and receiving replacement equipment from the internet service provider.

150.    The acts described herein constitute unauthorized entry, unlawful access to protected systems, interception of communications, and intrusion upon plaintiff's reasonable expectation of privacy, in violation of applicable federal and state statutes, including but not limited to: 18 U.S.C. §§ 2510–2523 (Electronic Communications Privacy Act / Title III); 18 U.S.C. § 1030 (Computer Fraud and Abuse Act). Their actions directly violate 18 U.S.C. §§ 241 and 242, 18 U.S.C §§ 1503 and 1512 (obstruction of justice, witness tampering) and 18 USC § 1519 (destruction, alteration, or falsification of records).

**FACTUAL ALLEGATIONS COMMON TO CAUSES OF ACTION**

Plaintiff hereby restates paragraphs (1)-(151) of this complaint, as though fully set forth below.

**Take notice:** all the vehicles used to facilitate the defendant's conduct suffer various VTL deficiencies. Vehicles characterized with such deficiencies reflect that of vehicles confiscated and or impounded within the defendant(s) City facilities.

151.    Plaintiff alleges that defendants City of New York (NYPD) and **Kathleen Fahey**, acting under color of state law, deprived her of rights secured by the Fourth Amendment to the United

States Constitution by failing to intervene and prevent known constitutional violations inflicted upon her by Hong Chen as required by law.

**Incident on or about April 2019 - February 2022: Constructive Discharge**

152.    While assigned to the 94th Precinct, plaintiff reported to Commanding Officer Captain Kathleen Fahey that her Executive Officer, Lieutenant Hong Chen created a hostile and retaliatory work environment for plaintiff.

153.    Lieutenant Chen engaged in repeated acts of verbal abuse and public humiliation toward the plaintiff. He weaponized her work assignments, assigned her substandard equipment, and interfered with her morale, all of which significantly impeded her ability to carry out her duties effectively. Lt. Chen subjected plaintiff to over-supervision by appearing at nearly all of her 911 assignments, even when supervisory presence was unwarranted, thereby undermining her authority and independence in the field.

154.    Lt. Chen reassigned 911 calls from other units to the plaintiff, forcing her to handle a disproportionate workload while other officers, including himself, remained idle at the precinct or in break areas. He also deliberately assigned the plaintiff to frivolous and time-consuming tasks or arrests initiated in other sectors by other officers, with the intent to harass, annoy, and burden her.

155.    This pattern of supervision endangered public safety by delaying the plaintiff's response to genuine emergency calls. When Lt. Chen was responsible for preparing the daily roll call, the plaintiff consistently received the least favorable assignments, including defective vehicles and inadequate equipment. In contrast, when other supervisors assigned duties more equitably, Lt. Chen would override those decisions to impose his punitive standards, despite the plaintiff's 15 years of senior service.

156.    Lt. Chen's conduct—though framed within the bounds of supervisory discretion—was retaliatory in nature and emblematic of a broader, systemic issue within the NYPD, where management often misuses official duties and disciplinary tools to punish targeted employees. This practice is expressly prohibited by department policy, including Administrative Guide Procedure 332-01 (Discrimination) and Patrol Guide Procedure 205-38 (Retaliation), which forbid the abuse of work assignments and conditions.

157.    While plaintiff cannot definitively state that Lt. Chen's actions were racially motivated, she observed a pattern in which Lt. Chen disproportionately targeted African American and Hispanic officers. His conduct fostered a discriminatory environment in which minority officers were routinely marginalized and made to feel inferior. As a result, plaintiff filed a complaint with the Federal Equal Employment Opportunity Commission.

**Incident on or about April 2012 - February 9, 2022: Constructive Discharge**

158.    The defendants abused their authority by weaponizing the NYPD Inspection Division, a satellite unit of Internal Affairs, to conduct repeated and baseless integrity tests against the

plaintiff. These tests included placing contraband in the plaintiff's patrol vehicle and orchestrating staged 911 calls intended to entrap her or scrutinize minor procedural missteps.

159.    Consequently, plaintiff was issued numerous petty Command Disciplines for infractions commonly overlooked in her peers. Although these minor disciplines are not placed in an officer's permanent record, they are often used internally to justify more severe disciplinary measures and termination. The Defendants' systematic targeting of the plaintiff contributed to her alienation, professional ostracism, and reputational harm.

160.    The conduct described above was not isolated but part of a deliberate and coordinated effort to create a hostile work environment and force the plaintiff out through retaliatory means.

161.    The defendant(s) NYPD supervision knew or should have known that their actions would result in psychological distress, workplace hostility, and impairment of the plaintiff's career;

**Incident on or about January 10, 2019:  Plaintiffs Residence**
162.    On or about January 10, 2019 "John Doe" (1) and (2) sat in a white four door sedan outside the plaintiffs prior residence at 89-34 Moline street, Queens, New York for several hours in a vehicle bearing New York registration #HTZ-3455. At approximately 2048 hrs the plaintiff left her home to a local laundromat. The defendants tailed and surveilled her at the location.

**Incident on or about February 17, 2019: Plaintiffs Residence**
163.    On or about February 17, 2019, Defendant "John Doe", while operating a silver Audi A6 bearing Pennsylvania registration number C41719, unlawfully tailed the plaintiff throughout the boroughs of Queens and Brooklyn, New York. The defendant ultimately positioned his vehicle at the corner of 89th Avenue and Moline Street, in close proximity to the plaintiff's residence, where he remained stationary for several hours in a manner intended to surveil, harass, and intimidate the Plaintiff.

**Incident on or about May 9, 2019: Nail Salon**
164.    On or about May 9, 2019 "John Doe" tailed and surveilled the plaintiff from her home to Precious Nail salon at 771 Flatbush Avenue. "John Doe" along with "Jane Doe" previously surveilled the plaintiff at a Diner near 235-20 Hillside Avenue. see Exhibit (9) On or about December 2, 2020 Jane Doe tailed the plaintiff in a GMC SUV bearing New York registration #GTB-5981 from her home to 150 Malcolm X Blvd Brooklyn, New York.

**Incident on or about December 15, 2020: Retail Establishment**
165.    On or about December 15, 2020 "John Doe" tailed and surveilled the plaintiff from her home to a Dollar General located at 250 Jericho Turnpike. "John Doe" with malicious intent informed the store employees the plaintiff was a shoplifter. At which time the employee actions changed to the appropriate protocol to address that of a shoplifter.

 **Incident on or about April 18, 2021: Airport**
166.    On or about April 18, 2021 at approximately 1238 "John Doe" tailed and surveilled the plaintiff from her home, along the interstate and throughout LaGuardia Airport while she awaited

her flight.

**Incident on or about May 10, 2021: Surveillance throughout Brooklyn**

167.    On or about May 10, 2021 "John Doe" tailed the plaintiff in a white four door sedan bearing New York registration #JPE-1646 about Broadway Avenue, Brooklyn, New York.

**Incident on or about June 2, 2021: JRP Jackie Robinson PWKY/ Hillside Honda**

168.    On or about June 2, 2021 "John Doe" (1) and "John Doe" (2) tailed the plaintiff from 150 Malcolm X Blvd to Hillside Honda located at 140-24 Queens Blvd. "John Doe" (1) operated a black Honda bearing Pennsylvania registration #LDN-7168. "John Doe" (1) recklessly tailgated the plaintiff along the JRP expressway. "John Doe" (2) the passenger yelled to the plaintiff "Get [expletive] off the Job". Upon arriving at her destination "John Doe" (2) exited his vehicle and walked within inches of the plaintiff driver's side window.

**Incident on or about June 7, 2021: Retail Establishment**

169.    On or about June 7, 2021 at approximately 1130 hrs "John Doe" tailed the plaintiff in a multi colored van which displayed the logo Approve Fire Prevention while bearing New York registration #44520-MD. "John Doe" tailed and surveilled the plaintiff from 150 Malcolm X Blvd to a Walgreens on Jericho Turnpike. "John Doe" with malicious intent informed the store employees the plaintiff was a shoplifter. At which time the employee actions changed to the appropriate protocol to address that of a shoplifter. The defendants regularly use this tactic to annoy and harass the plaintiff.

**Incident on or about July 28, 2021: Brooklyn Hospital**

170.    On or about July 28, 2021 "John Doe" (1) and "Jane Doe" (1) tailed the plaintiff from 150 Malcolm X Blvd to Brooklyn Hospital located at 121 Dekalb Avenue in Brooklyn, New York. Upon her arrival "John Doe" (2) surveilled the plaintiff about the surgery waiting area where he used threatening/abusive language when he realized the plaintiff had taken his picture. He said to the plaintiff who is African American [ "explicative"] "why don't you just retire". The plaintiff exited the location in pursuit of "John Doe" (2) at which time she encountered "John Doe" (3)(4) and (5). The defendants crowded the plaintiff's personal space and quickly disbursed. "John Doe" (3) regurgitated "Just retire" as he walked away. "John Doe" (1) and "Jane Doe" (2) operated a black Honda HRV bearing NYS registration KLX-2537 which was used to block the plaintiff vehicle. Plaintiff reported this conduct to the Federal EEO Commission.

**Incident on or about September 17, 2021: Family Residence**

171.    On or about September 17, 2021 "John Doe" and "Jane Doe" were observed lurking about the lobby of the plaintiffs grandmother's home at 150 Malcolm X Blvd, Brooklyn, New York. On a previous occasion "John Doe" was observed outside the plaintiffs home at 89-34 moline street Queen, New York.

**Incident on or about November 10, 2021: 94th Precinct**

172.    On or about November 10, 2021 "John Doe" with the intent to cause the plaintiff

30

annoyance and alarm during her tour of duty, "John Doe" walked back and forth past her snarling and laughing while she was assigned to the security at the station house.

**Incident on or about February 12, 2022: Applebee's**

173.    On or about February 12, 2022 "John Doe"(1)(2) **three days** following plaintiffs retirement tailed the plaintiff from her grandmother's home in Brooklyn to Applebee's located at 1710 Hempstead turnpike Elmont, NY 11003. Plaintiff's sole intent was to intimidate and harass her.

**Incident on or about February 17, 2022: Vehicle Service Station**

174.    On or about February 17, 2022 "Jane Doe" (1)(2) and "John Doe" (1) tailed and surveilled the plaintiff for **eight days** following her retirement. Defendants' tailed the plaintiff from 150 Malcolm X Blvd to a vehicle service station at the intersection of Bedford Avenue & Willoughby Avenue in Brooklyn, New York. "Jane Doe" (1) walked within inches of plaintiff's vehicle, "Jane Doe" noticed the plaintiff snapped her picture at which time she stated "I don't care about your pictures". "John Doe" (1) and "Jane Doe" (2) mirrored prior used tactics walking within close proximity to the plaintiff vehicle.

**Incident on or about September 20, 2022: Quest Diagnostics**

175.    On or about September 20, 2022 "John Doe" tailed and surveilled the plaintiff **6 months** after her retirement, in a USDOT tow truck bearing New York registration #11758TV. "John Doe" tailed plaintiff from 150 Malcolm X Blvd, Brooklyn, New York to Quest Diagnostics at 147 Greenpoint Avenue, Brooklyn and to 579 Gateway Drive through Brooklyn, New York.

**Incident on or about November 21, 2022: Atlantis Wash & Lube**

176.    On or about November 21, 2022 throughout Atlantis Wash & Lube located at 1650 Bushwick Avenue Brooklyn, New York "John Doe"(1)(2) surveilled and harassed the plaintiff. Defendants' only intent was to intimidate and harass her.

**Incident on or about November 22, 2022: Retail Establishment**

177.    On or about November 22, 2022 with the intent to intimidate, surveille and harass, "Jane Doe" tailed and surveilled plaintiff to DII's discount store located on 775 Manhattan Avenue Brooklyn, New York. At which time "Jane Doe" stated to the plaintiff to "Stop the BS".

**Incident on or about November 25, 2022: Staples**

178.    On or about November 25, 2022 at approximately 1036 hrs, "Jane Doe" attempted to unlawfully obtain a copy of the plaintiff documents she prepared inside of Staples located at 409 Gateway Drive Brooklyn, New York. "Jane Doe" identified herself to store managers Amanda and Mohammad as a police officer by showing her badge. "Jane Doe" requested Amanda and Mohammad reprint the plaintiffs documents. The plaintiff advised the store managers the documents were evidence and were privileged.

**Incident on or about November 25, 2022: Target / Post Office**

179.    On or about November 25, 2022 "John Doe" (1)(2) with the intent to intimidate and harass made a statement the plaintiff later perceived as a threat. "John Doe" (1)(2) was standing behind the plaintiff in a checkout line at Target located at 579 Gateway Drive, Brooklyn, New York conversing amongst each other that a female will go missing. The plaintiff dismissed the conversation as she did not know the individuals. However, approximately one hour later "John Doe" (1)(2) resurfaced again in line at Bellerose Post Office located at 23715 Braddock Avenue in the borough of Queens where she was also patronizing the establishment. Plaintiff cannot identify with any degree of certainty that "John Doe"(1)(2) are NYPD officers; however plaintiff believes there is a causal connection between the defendants.

**Incident on or about January 6, 2023: Staples**
180.    On or about January 6, 2023 "John Doe" and "Jane Doe" attempted to unlawfully obtain a copy of the document she prepared inside of a Staples located at 25121 Jericho Turnpike, Queens, New York. "John Doe" engaged the store manager Steve while "Jane Doe" surveilled her at the copy machine. The plaintiff advised the store managers the documents were privileged.

**Incident on or about October 30, 2023: Family Residence**
181.    On or about October 30, 2023, defendant "Jane Doe" placed a telephone call to plaintiff's 82-year-old grandmother, during which she yelled and demanded that the grandmother place plaintiff on the line, asserting that she knew plaintiff was present.  On or about December 2021, the defendants (informant) took occupancy of Apartment 3Z, an apartment previously vacant and located directly across from plaintiff's grandmother's residence. Said residence is a senior housing facility designated for elderly individuals of limited income. From that location, defendants engaged in persistent surveillance/harassment of plaintiffs and her grandmother's movements in and around the premises.

**Incident on or about February 5, 2024: McDonalds**
182.    On or about February 5, 2024 at approximately 0957 hrs, John Doe (1)(2)(3) and Jane Doe (1)(2) with the intent to intimidate, surveille, and harass used two vehicles one bearing New York registration #KYF-9688 the other Virginia registration #TRB-6211 surrounded and blocked the plaintiff vehicle after she parked and entered a Mcdonald's at 1380 Broadway, Brooklyn, New York.

**Incident on or about January 18, 2025: Home Goods**
183.    On or about January 18, 2025 at approximately 1053 hrs, John Doe and Jane Doe with the intent to harass tailed the plaintiff to Marshalls department store at 1240 Old Country Rd Carle Place, New York, where they informed the store employees that the plaintiff is a shoplifter. At which time the employee's actions changed to a protocol to address a shoplifter. The defendants use and continue to employ these tactics for the purpose of annoying and harassing the plaintiff.

**Incidents on or about September 11, 2025- activity recurring:  Various locations/Interstate**

184.    At all relevant times, defendants, acting under color of law and/or in concert with private actors, engaged in a continuing course of conduct that included warrantless and covert entries into plaintiff's home and vehicle, targeted surveillance, and coordinated harassment intended to chill plaintiff's exercise of constitutional rights and to discredit her reports by portraying her as irrational.

185.    Defendants formed and participated in an enterprise—mirroring a COINTELPRO-like operation—that spans multiple agencies and jurisdictions and relies on false pretenses to solicit participation from civilians, including vulnerable persons, minors, and known offenders, as well as law-enforcement personnel.

186.    This enterprise functions to monitor, stalk, intimidate, and isolate. The conduct is shocking to one's sense of consciousness, thus constituting a grave abuse of process and authority as a matter of law.

187.    Defendants' concerted actions deprived plaintiff of rights secured by the First, Fourth, and Fourteenth Amendments, including freedom from unreasonable searches and seizures, equal protection, and the right to petition and access the courts, in violation of 42 U.S.C. § 1983; and combined and conspired to do so, in violation of 42 U.S.C. § 1985(3).

188.    Defendant(s) Doe are engaging in extreme and outrageous conduct—including covert, years-long tracking and surveillance; orchestrated surround tactics in public commerce and during interstate travel; home intrusions; evidence destruction; and communications/wireline interference—with the intent to cause, or reckless disregard of the likelihood of causing, severe emotional distress and risk to plaintiff personal safety.

189.    As part of defendants' means and methods, their agents have commenced obscuring vehicle identifiers by using paper/temporary tags, dealer plates, and vehicles with blackout-level tinting, thereby evading detection and accountability. Their coordinated misuse of governmental processes and institutional channels has frustrated plaintiff's efforts to identify specific actors, preserve evidence, and secure timely judicial relief.

**WHEREFORE (Emergency Injunctive Relief & Protective Order)**

**WHEREFORE**, Plaintiff respectfully requests that the Court, pursuant to Fed. R. Civ. P. 65 and the Court's equitable powers, issue emergency injunctive relief, including a Protective Order for plaintiff and for family members and close associates to be identified to the Court (including, if appropriate, in a sealed Schedule A), and that the Court enter an Order:

a)    Temporarily Restraining defendants, their agents, employees, contractors, and all persons acting in concert with them, from directly or indirectly engaging in any harassment, intimidation, surveillance (physical, electronic, or digital), stalking, threats, doxxing, or other retaliatory conduct toward plaintiff or the protected persons, effective immediately and pending

33

further order of the Court;

b)      Requiring defendants to maintain a minimum stay-away/no-contact radius from plaintiff's residence(s), workplace(s), and routine places of travel and to refrain from initiating any communication with plaintiff or the protected persons outside counsel-to-counsel communications;

c)      Enjoining defendants from instigating, directing, or encouraging third parties—including neighbors, employers, contractors, or court personnel—to engage in any retaliatory, harassing, or defamatory conduct toward plaintiff or the protected persons;

d)      Enjoining defendants from interfering with the employment, business relations, housing, travel, or access to public accommodations of plaintiff or the protected persons, including any blacklisting, adverse referrals, or improper dissemination of stigmatizing information;

e)      Prohibiting defendants from initiating or continuing any non-judicial monitoring, tracking, or data collection on plaintiff or the protected persons (including GPS or cell-site tracking; license-plate capture; exploitation of home security systems; or unauthorized access to phones, emails, or cloud accounts), except as expressly authorized by a judicial warrant supported by probable cause and consistent with all applicable constitutional and statutory requirements;

f)      Prohibiting any ex parte communications by defendants with court personnel concerning plaintiff's pending or future filings, and directing that any necessary communications be made on notice and placed on the record;

g)      Preservation of Evidence. Ordering defendants and those in concert with them to preserve—and to instruct all relevant third parties to preserve—without alteration or deletion, all potentially relevant evidence, including but not limited to: emails, texts, chat messages, call logs, body-worn-camera and surveillance video, dispatch/CAD logs, investigative files (including Internal Affairs and Inspector General materials), access logs to plaintiff's electronic accounts or devices, license-plate-reader records, GPS/ping data, FOIL/records-request files and audit trails, and any materials from private vendors or home-security providers;

h)      Limited, targeted expedited discovery (as the Court deems appropriate) on issues necessary to police compliance with this Order and to prevent ongoing harm, including identification of the individuals and units involved, the nature and scope of any surveillance or monitoring, and the disclosure of any directives authorizing the challenged conduct;

i)      Ordering that the identities and addresses of plaintiff and protected persons may be filed under seal to protect safety and privacy, and that service of the Order may be effected by alternative means if necessary to ensure prompt notice;

j)      Setting this matter down for a prompt hearing on a preliminary injunction and, after such hearing, converting the temporary restraints into a preliminary injunction, and upon final

judgment, issuing a permanent injunction of the same scope;

k)    Granting such other and further relief as the Court deems just and proper.

### FIRST CAUSE OF ACTION:  (18 U.S.C § 1962 (d))
### VIOLATION OF RACKETEERING INFLUENCED AND CORRUPT ORGANIZATION
### (18 USC § 1962 (c))

(Against All Individual Defendants (42 U.S.C § 1983, 42 U.S.C § 1985); against the City as separately pled under 42 U.S.C. § 1983)

190.    Plaintiff restates and incorporates by reference all preceding paragraphs as though fully set forth herein;

191.    At all relevant times, the Individual defendants were "persons" within the meaning of 18 U.S.C. § 1961(3);

192.    The "NYPD Enterprise" is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of NYPD personnel and affiliated actors who, through coordinated roles (including but not limited to Internal Affairs intake/mishandling, Legal Bureau interference, record-withholding, field surveillance, and inter-agency communications), functioned as a continuing unit with a common unlawful purpose: (a) concealing official misconduct; (b) silencing and punishing plaintiff for whistleblowing and petitioning for redress; (c) misusing investigative and legal processes to protect members of the enterprise; and (d) diverting public resources to unauthorized, retaliatory operations to obtain money and maintain power;

193.    The enterprise maintained ongoing structure and decision-making through informal chains of command and use of NYPD facilities, equipment, email systems, vehicles, databases, and public funding. Each individual defendant was employed by or associated with the enterprise and conducted or participated, directly or indirectly, in the conduct of its affairs. The enterprise is distinct from the Individual defendants as RICO "persons";

194.    From at least 2019 to the present, the Individual defendants engaged in a "pattern of racketeering activity," 18 U.S.C. § 1961(5), consisting of at least two predicate acts within ten years that are related and amount to or pose a threat of continued criminal activity. The racketeering predicates include, without limitation, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), honest-services fraud (18 U.S.C. § 1346), obstruction of justice (18 U.S.C. § 1503), witness tampering (18 U.S.C. § 1512), and retaliation against a witness/informant (18 U.S.C. § 1513);

Predicate Group 1 – Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343, 1346)
195.    In furtherance of the scheme to defraud and to deprive plaintiff of her intangible right to the honest services of public officials, defendants devised and executed a course of conduct to transmit materially false statements and pretenses via mail and interstate wires to government and commercial entities—including, without limitation, the United States Postal Service, airlines

and airport personnel, maritime ports, municipal agencies (including CMPD), financial institutions, and internal NYPD records/audit functions;

196.    The false and misleading transmissions were intended to and did: (a) fabricate the appearance of legitimate investigations into plaintiff; (b) induce third parties to take adverse actions against plaintiff (including defamation, denial of opportunities, and credit impairment); and (c) obtain and justify unauthorized public expenditures (e.g., overtime and travel) tied to sub rosa operations. The use of the mails and interstate wires was integral to, and reasonably foreseeable in, executing the scheme;

Predicate Group 2 – Obstruction of Justice (18 U.S.C. § 1503) and related Interference
197.    Defendants corruptly endeavored to influence, obstruct, and impede the due administration of justice by withholding and delaying production of personnel, disciplinary, and investigative records; manipulating Internal Affairs complaint handling; interfering with plaintiff's EEOC and Article 78 matters; and engaging in ex parte interference and unilateral cancellation/rescheduling of a required 50-h hearing without notice or courtesy;

198,    Defendants' multi-year refusal to produce exculpatory materials—despite lawful requests—was undertaken in bad faith and in retaliation for plaintiff's protected complaints and litigation, and included ex parte communications calculated to delay, prejudice, and inhibit plaintiff's access to judicial and administrative relief;

199.    Defendants interfered with plaintiff's Article 78 proceedings in Kings County Supreme Court by engaging in improper ex parte contact with court personnel, resulting in an unlawful dismissal for "failure to appear," although no appearance had been ordered. Defendants have further refused to produce names, dates, and records tied to their conspiracy, thereby perpetuating obstruction and concealment;

Predicate Group 3 – Witness Tampering and Retaliation (18 U.S.C. §§ 1512, 1513)
200.    In retaliation for plaintiff's reports to law-enforcement and oversight authorities (including IAB, EEOC, and other agencies), defendants disseminated false statements to financial institutions to impair plaintiff's access to funds and credit, and orchestrated retaliatory conduct including micromanagement, humiliation, disparate workloads, "integrity tests," sub rosa investigations lacking due process, and punitive notations in plaintiff's Central Personnel Index to deter her cooperation;

201.    IAB officers—including, upon information and belief, Ellis, Fitzgerald, and DeLossantos—conspired to mishandle and obstruct Internal Affairs complaints by ignoring protocols, abandoning investigations, and obstructing oversight, thereby engaging in witness tampering and retaliation in violation of 18 U.S.C. §§ 1512 and 1513, coercing Micheal Digilo and Hector Santiago to withdraw the true statements to the facts;

202.    The predicates are related in purpose, results, participants, victims, and methods of commission; they pose a threat of continued criminal conduct and, in fact, have continued for

years;

203.    The enterprise's activities, and defendants' racketeering acts, affected interstate commerce, including interstate communications, travel, use of financial networks, and transmissions to out-of-state agencies and commercial actors;

204.    Each individual defendant was employed by or associated with the enterprise and conducted or participated, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c);

205.    Additionally, defendants knowingly agreed and conspired to violate § 1962(c), and agreed that at least one conspirator would commit two or more racketeering acts to further the enterprise, in violation of 18 U.S.C. § 1962(d);

206.    As a direct and proximate result of defendants' violations of § 1962(c) and (d), plaintiff suffered injury to her "business or property," including but not limited to: out-of-pocket costs for relocation, security, and mitigation; financial and reputational damage that interfered with prospective employment in law-enforcement-adjacent fields (including USPS, airlines, and ports); loss of economic opportunities; and other pecuniary losses to be proven at trial;

207.    Plaintiff has also suffered severe emotional distress. While such distress is independently actionable under state law, the foregoing economic harms satisfy RICO's "business or property" requirement;

208.    Plaintiff seeks treble damages, punitive damages,  and reasonable mitigations' fees as authorized by 18 U.S.C. § 1964(c);

209.    Plaintiff further seeks appropriate equitable relief—including injunctive relief to prevent ongoing racketeering conduct—under the Court's equitable powers and to the extent permitted under RICO and applicable Second Circuit authority; in the alternative, plaintiff seeks comparable equitable protections through her separately pled constitutional claims (42 U.S.C. § 1983) and the Court's inherent powers.

### SECOND CAUSE OF ACTION: INTERSTATE STALKING
### (42 U.S.C 2261(a))

(Against All Individual defendants 42 U.S.C § 1983 and 42 U.S.C § 1985; against the City as separately pled under 42 U.S.C. § 1983)

210.    Plaintiff restates and incorporates by reference all prior paragraphs as if fully set forth herein;

211.    At all relevant times, defendants "John Doe" and "Jane Doe," sworn officers, using their badges, training, police vehicles, police identifiers (including "color-of-the-day" bands), restricted law-enforcement access points, and other indicia of official authority to surveil, stalk, harass, and intimidate plaintiff across state lines. Defendants' conduct was undertaken while purporting

to perform law-enforcement functions or by misuse of power made possible only because of their official status;

212.    Acting individually and in concert, defendants engaged in a continuing "course of conduct" intended to harass, intimidate, and place plaintiff in reasonable fear for her safety, and to interfere with her use and enjoyment of her home and freedom of movement, including interstate travel. To conceal their actions, they tampered with witnesses, spread falsehoods to the Charlotte-Mecklenburg Police Department, and orchestrated a defamatory smear campaign in the plaintiff's local community, in violation of 18 U.S.C. § 2261A (interstate stalking);

213.    The above deprivations were undertaken intentionally, maliciously, and/or with reckless disregard for plaintiff's federally protected rights. Each defendant personally participated, directed, or knowingly acquiesced in the misconduct;

214.    As a direct and proximate result, plaintiff suffered and continues to suffer emotional distress, anxiety, insomnia, headaches, loss of liberty of movement, invasion of privacy, property damage, out-of-pocket expenses for security and relocation, and other compensable injuries.

215.    Plaintiff further seeks appropriate equitable relief—including injunctive relief to prevent ongoing Instate Stalking —under the Court's equitable powers.  Plaintiff seeks comparable equitable protections through her separately pleaded constitutional claims (42 U.S.C. § 1983) and the Court's inherent powers.

**THIRD CAUSE OF ACTION: RETAILITION AGAINST A WHISTLEBLOWER UNDER CIVIL SERVICE LAW § 75-b PRAYER FOR RELIEF (42 U.S.C. §§ 1983 and 1985 – First Amendment Retaliation & Procedural Due Process) and New York Labor Law § 740**

(Against All Individual Defendants 42 U.S.C § 1983 and 42 U.S.C § 1985; against the City as separately pled under 42 U.S.C § 1983).

216.    Plaintiff restates and incorporates by reference all prior paragraphs as if fully set forth herein;
217.    At all relevant times, defendants were employees and officials of the City of New York and the NYPD acting within the scope of their employment and under color of state law;

218.    Plaintiff engaged in protected activity, including whistleblowing and objections to unlawful or unsafe practices, including defendants abuse of power, abuse of process, misconduct, and retaliation. In retaliation, defendants weaponized the NYPD disciplinary process to punish and deter plaintiff therefore violate her rights secured by the Constitution and laws of the United States;

219.    On or about June 15, 2021, defendants served plaintiff with departmental Charges and Specifications arising from a June 28, 2019 incident involving plaintiff's use of pepper spray. defendants then weaponized the disciplinary process to punish plaintiff, including by excluding

her from the fact-finding process, denying required notice and representation, withholding an opportunity to accept a negotiated penalty disposition or challenge the charges and denying her a full departmental trial, contrary to New York Civil Service Law §§ 75–76 and applicable NYPD procedures;

220.    Defendants further failed to transmit the Charges and Specifications to plaintiff's union attorney and willfully ignored the statutory 18-month limitations period for adjudicating disciplinary charges. Rather than timely adjudicating, defendants allowed the matter to languish for nearly five years, until it was administratively closed in or about April 2024. By doing so, defendants deprived plaintiffs of a meaningful opportunity to be heard at a meaningful time and in a meaningful manner, in violation of the Fourteenth Amendment;

221.    Defendants' actions were substantially motivated by retaliatory animus against plaintiff for her protected activity and/or invidious discriminatory animus. Defendants intentionally used the pendency of the charges as a pretext to inflict professional and economic harm;

222.    As a direct and foreseeable result of defendants' retaliatory and unlawful conduct, plaintiff was deprived of tangible property and benefits, including—but not limited to—approximately **$20,000** in terminal-leave payout, and was denied a "good-guy" letter customarily issued upon retirement, which in turn obstructed her ability to obtain a NYC pistol permit in NYC. Defendants had discretion and the ability under NYPD policy (including Patrol Guide § 205-42) to promptly adjudicate the charges prior to plaintiff's retirement but intentionally failed to do so;

223.    Defendants subjected the plaintiff to a constructive discharge (retirement) and loss of 3 years of future wage benefits resulting in an estatemate of loss **$450,000** of scheduled future salary upon her 20th anniversary, approx **$10,000** yearly actuary decrease in pension earnings. The protracted and unresolved disciplinary accusations, coupled with the denial of standard separation credentials, sub rosa investigations imposed a stigma and altered the plaintiff's legal status, burdening her reputation and impairing her ability to pursue licensed activities, thereby violating her Fourteenth Amendment liberty interests;

224.    Defendants, without any legal or factual basis, compelled the plaintiff to undergo a psychiatric evaluation.  The psychiatric evaluation was not job-related and was not consistent with business necessity, in violation of 42 U.S.C. § 12112(d)(4)(A);

225.    Lieutenant Chen's conduct created a hostile work environment, lowered plaintiffs' morale, and intentionally isolated her from her peers. Plaintiff reasonably believed such conduct was motivated, in part, by racial animus.  Defendants John Doe and Jane Doe of the NYPD Internal Affairs Bureau and Inspection Division subjected plaintiffs' to repeated and baseless "integrity tests," unauthorized sub rosa investigations, and abusive disciplinary penalties, surveillance and harassment;

226.    The hostile work environment, retaliation, and unlawful medical examination contributed to plaintiffs' early retirement after 17 years of dedicated service. Plaintiff has suffered and continues to suffer loss of income, loss of career opportunities, emotional pain, suffering, humiliation, and loss of enjoyment of life together with other special and consequential damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION: TITLE III - ELECTRONIC COMMUNICATIONS PRIVACY ACT (ECPA) 18 USC 2510 et seq. CLAIMS
### 18 U.S.C. §§ 2510–2522 (Wiretap Act) and §§ 2701–2712 (Stored Communications Act)

(Against the Individual Defendants under 42 U.S.C. §§ 1983 and 1985; against the City under § 1983 as separately pled; also First Amendment Retaliation; Fourth Amendment Unreasonable Search/Seizure; Fourteenth Amendment Due Process).

227.    Plaintiff restates and incorporates by reference all prior paragraphs as if fully set forth herein;

228.    At all relevant times, the Individual defendants acted under color of state law and in concert with one another and/or persons unknown, and the City is liable under § 1983 as separately pled pursuant to Monell for policies, customs, or deliberate indifference that caused or were the moving force behind the violations described herein;

229.    Defendants conspired and agreed to conduct warrantless, continuous, real-time tracking of plaintiff and her vehicle; to deploy surveilling vehicles to converge on and surround plaintiff; and to repeatedly intrude upon plaintiff's home and curtilage. Their prolonged location tracking, home intrusions, removal of recording media, and seizure/destruction of surveillance footage constituted searches and seizures without a warrant or valid exception, violating plaintiff's clearly established rights under the Fourth and Fourteenth Amendments, enforceable via 42 U.S.C. §§ 1983 and 1985;

230.    Defendants' course of conduct—including covert, continuous surveillance; intrusion into plaintiff's residence; manipulation and sabotage of home security systems; and destruction of surveillance evidence—shocks the conscience and arbitrarily intrudes upon plaintiff's core privacy and bodily security interests, depriving plaintiff of substantive due process;

 Wiretap Act, 18 U.S.C. §§ 2510–2522
231.    The Wiretap Act prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring another to intercept any wire, oral, or electronic communication, as well as the intentional use or disclosure of the contents of such communications knowing or having reason to know they were obtained through an unlawful interception. 18 U.S.C. § 2511;

232.    Defendants intentionally intercepted, endeavored to intercept, and/or procured others to intercept plaintiff's wire and electronic communications without consent and without a court order, and intentionally used and disclosed contents of those communications knowing (or with reason to know) they were unlawfully obtained, in violation of 18 U.S.C. § 2511(1)(a), (c), and

(d);

233.    No statutory exception applies. Any reliance on law-enforcement or consent exceptions is pretextual and inapplicable because the interceptions were not undertaken pursuant to a valid warrant or court order, lacked exigent circumstances, and were adverse to plaintiff's interests;

243.    As a result, plaintiff is entitled to relief under 18 U.S.C. § 2520, including (a) preliminary and equitable relief; (b) the greater of actual damages suffered by plaintiff and any profits made by defendants or statutory damages of the greater of $100 per day for each day of violation or $10,000; (c) punitive damages for willful/reckless violations; and (d) reasonable attorneys' fees and costs;

ECPA – Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701–2712
245.    The SCA prohibits intentionally accessing without authorization (or exceeding authorized access to) a facility through which an electronic communication service is provided and thereby obtaining, altering, or preventing authorized access to a wire or electronic communication while it is in electronic storage. 18 U.S.C. § 2701(a);

246.    Defendants intentionally accessed plaintiff's protected computers, devices, home-network equipment, and cloud-based accounts without authorization or in excess of authorization by, inter alia, introducing or maintaining an unauthorized "Resideo Home Security" device on the network, repeatedly re-compromising the network after password and equipment changes, and accessing and deleting stored data and backups;

247.    Defendants thereby obtained information from, altered, and prevented authorized access to electronic communications in storage and to associated account data, in violation of 18 U.S.C. § 2701(a), and used or disclosed the contents and records in violation of 18 U.S.C. §§ 2702–2703;

248.    As a result, plaintiff is entitled to relief under 18 U.S.C. § 2707, including (a) preliminary and equitable relief; (b) the greater of actual damages and any profits made by defendants or statutory damages of at least $1,000; (c) punitive damages for willful/reckless violations; and (d) reasonable attorneys' fees and costs;

Resulting Harm and Additional Torts
249.    Defendants obtained information from, and caused impairment to, the integrity and availability of plaintiff's data and systems, resulting in "loss"—including costs to investigate, assess damage, restore data, replace equipment, and harden security—exceeding $30,000 over a four-year period. Defendants also wrongfully exercised dominion and control over plaintiff's tangible property by removing home-security SD cards and depriving plaintiff of their use and of recorded data, constituting conversion and trespass to chattels under state law (pled separately if desired);

250.    Defendants' actions were undertaken in retaliation for plaintiff's protected speech and petitioning activity and to chill her future speech, in violation of the First Amendment (enforceable via § 1983), compounding the ECPA violations.

Prayer for Relief (as to this Cause of Action)
**WHEREFORE**, Plaintiff respectfully requests judgment against the Individual Defendants (and against the City under § 1983 as separately pled) awarding:

a. Declaratory judgment that defendants violated the Wiretap Act, 18 U.S.C. §§ 2510–2522, and the SCA, 18 U.S.C. §§ 2701–2712, and infringed plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments;

b. Preliminary and permanent injunctive relief enjoining defendants from any further interception, access, use, or disclosure; requiring the return and/or verified destruction of all unlawfully obtained communications, data, and derivatives; and requiring remediation of compromised devices/accounts;

c. Statutory damages under 18 U.S.C. § 2520(c)(2) (the greater of actual damages and any profits or $100/day for each day of violation or $10,000) and under 18 U.S.C. § 2707(c) (the greater of actual damages and any profits or statutory damages of at least $1,000);
d. Compensatory damages, including but not limited to economic loss, costs of investigation and remediation, replacement of equipment, data restoration, emotional distress, and reputational harm;

e. Punitive damages for willful and/or reckless violations;

f. Reasonable mitigation fees and costs under 18 U.S.C. §§ 2520(b)(3) and 2707(b)(3), and 42 U.S.C. § 1988; and

g. Such other and further relief as the Court deems just and proper.

.        As a direct and proximate result, plaintiff suffered loss of security footage and data (evidence), invasion of privacy, intentional infliction of emotional distress, anxiety and other damages. Defendants' actions were deliberate, undertaken with reckless indifference to plaintiff's rights. Defendants intentionally intruded, physically and electronically, upon plaintiff's solitude and private affairs in a manner that would be highly **offensive to a reasonable person.**

### FIFTH CAUSE OF ACTION: MUNICIPAL LIABILITY

(Against the City of New York; Individual Defendants liable as separately pled)(First, Fourth, and Fourteenth Amendments)

251.    Plaintiff restates and incorporates by reference all prior paragraphs as if fully set forth herein;

252.    At all relevant times, defendant City of New York ("City") operated and controlled the New York City Police Department ("NYPD"). The NYPD Police Commissioner(s) during the relevant period were final policymakers for the City with respect to training, supervision, discipline, investigations, records retention/production, and the use of investigative resources and surveillance authorities;

253.    The City is liable under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), because plaintiff's injuries were caused by: (a) the City's formal policies and/or widespread customs and practices; (b) the City's deliberate indifference in failing to train, supervise, investigate, discipline, and control its employees; and/or (c) decisions and ratifications of final policymakers that were the moving force behind the constitutional violations;

254.    Plaintiff alleges that NYPD policymakers and supervisors, acting pursuant to an official policy, custom, or practice, failed to utilize established procedures to address workplace concerns and, instead, sanctioned the misuse of departmental resources and coordination with external actors for retaliatory purposes;

255.    Upon information and belief, and as evidenced by the incidents alleged herein, the City maintained and permitted policies, patterns, customs, and practices, including but not limited to:

256.    Retaliatory use of "sub-rosa" investigations, off-the-books "integrity tests," and covert surveillance to punish whistleblowing, petitioning, or other protected speech and to chill officers from reporting misconduct;

257.    Misuse of disciplinary processes—including withholding or delaying GO-15 hearings and union representation; exceeding statutory timelines; and weaponizing command disciplines and assignments—to punish targeted employees and obstruct redress (e.g., the June 28, 2019 pepper-spray matter pursued past the 18-month limitations period; refusal to forward charges to union counsel; administrative closure only in April 2024);

258.    Retaliatory and pretextual referrals to NYPD Psychological Services to stigmatize and discredit targeted officers, including recording clinical encounters without informed consent and beyond legitimate medical purposes (e.g., April 13, 2021 referral and recording);

259.    Systemic failure to intake, assign, investigate, or resolve Internal Affairs Bureau ("IAB") and Inspection Division complaints when the subjects are NYPD personnel aligned with command interests, including abandonment of investigations after complainant notice and ongoing exposure to harm (e.g., contacts by IAB Officers Ellis, Fitzgerald, and DeLossantos; cessation of communications; abandonment upon leadership changes);

260.    Persistent obstruction, delay, and/or concealment of personnel, disciplinary, and investigatory records in violation of state and federal law—including continued withholding after the repeal of N.Y. Civ. Rights Law § 50-a and in dereliction of New York FOIL obligations—to frustrate litigation, suppress exculpatory material, and preclude accountability (e.g.,

non-production by records officers Katherine Obanhiem, Matthew Ficara, and Fabiana Canelliz for over three years; failure to produce on April 4, 2025);

261.    Unauthorized acquisition, use, or facilitation of electronic surveillance and location-tracking tools, without probable cause, warrants, or other lawful process, to monitor, track, and harass targeted individuals, including misuse of departmental databases, communications systems, and investigative infrastructure (e.g., real-time vehicle tracking, deletion of security footage, unexplained device/network intrusions, and repeated compromise of home systems);

262.    Retaliatory and intimidatory off-duty conduct—including orchestrated noise campaigns, false shoplifting accusations to third-party businesses, harassment of family members, and coordinated interstate surveillance—tolerated and/or encouraged by supervisors;

263.    A pattern and practice of discouraging or refusing to take complaints from targeted individuals (including sworn officers) and of directing them away from formal reporting channels, thereby ensuring no paper trail, no relief, and no discipline;

264.    These customs and practices were so widespread, persistent, and well-settled as to constitute de facto City policy. They were known to, condoned by, and/or ratified by City policymakers and supervisory officials, who acted with deliberate indifference despite repeated notice and obvious consequences;

265.    The City failed to train and supervise NYPD members regarding: (i) constitutional limits on surveillance, searches, and seizures; (ii) anti-retaliation obligations for protected speech and petitioning; (iii) lawful disciplinary procedures and timelines; (iv) FOIL compliance and post-repeal § 50-a records-production; (v) proper intake and investigation of IAB complaints; and (vi) prohibitions against misuse of official authority and investigative resources for personal or retaliatory purposes;

266.    The need for such training and supervision was obvious in light of recurring violations, the City's own policies (including Patrol Guide provisions prohibiting retaliation and requiring fair discipline), plaintiff's repeated complaints to the Police Commissioner, IAB, the Inspector General for the NYPD, and filings with the EEOC, and continued incidents thereafter; yet the City failed to implement corrective training, supervision, or discipline;

267.    The NYPD Commissioner(s) and other final policymakers with authority over investigations, discipline, and records production were placed on notice of plaintiff's reports of surveillance, retaliation, and obstruction and either (a) directed or approved the challenged actions; (b) abandoned or halted investigations without safeguards; and/or (c) ratified subordinates' unconstitutional conduct by failing to act, thereby making those decisions and non-decisions the moving force behind the violations of the First, Fourth, and Fourteenth Amendments;

268.    To the extent any single decision by a final policymaker—including, without limitation, refusal to produce records after appeal, abandonment of an Internal Affairs inquiry, or decisions to pursue discipline outside statutorily permissible timelines—caused Plaintiff's injuries, the City is liable under Monell;

269.    As a direct and proximate result of the City's policies, practices, customs, and deliberate indifference, plaintiff suffered violations of her constitutional rights and sustained damages, including emotional distress and psychological injury, loss of liberty, reputational harm, economic loss, and other compensable harms;

270.    The City's failure to implement and enforce appropriate oversight mechanisms governing NYPD conduct enabled the individually named defendants to leverage municipal infrastructure and authority to engage in retaliation and other unlawful acts against plaintiff;

271.    As a direct and proximate result of the acts and omissions of the City and other defendants, known and unknown, **plaintiff has incurred—and will reasonably continue to incur—substantial litigation costs to vindicate her rights**, as well as out-of-pocket expenses for enhanced personal and property security measures until this matter is fully resolved.

Prayer for Relief (as to this Cause of Action):
**WHEREFORE**, Plaintiff demands judgment against defendant City of New York for compensatory damages, punitive damages where legally available, declaratory relief, mitigations' fees and costs pursuant to 42 U.S.C. § 1988, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

### SIXTH CAUSE OF ACTION

BIVENS / 42 U.S.C. § 1983; STATE-LAW TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, INVASION OF PRIVACY (INTRUSION UPON SECLUSION) (pled in the alternative), DEFAMATION (PER SE), AND CONSTRUCTIVE DISCHARGE (as damages)

(Against the Individual defendants in their individual capacities 42 U.S.C §§ 1983 and 1985)

272.    Plaintiff restates and incorporates by reference all prior paragraphs as if fully set forth herein;

273.    To the extent any individual defendant acted under color of federal authority, plaintiff brings this claim directly under Bivens for violations of her clearly established constitutional rights; to the extent any individual defendant acted under color of state law, plaintiff brings this claim under 42 U.S.C. § 1983. The City of New York's liability, if any, is asserted solely under Monell as separately pled and not under respondeat superior;

274.    Defendants, acting under color of federal and/or state authority, deliberately and unlawfully placed plaintiff on a Foreign Intelligence Surveillance Act ("FISA") watchlist for retaliatory purposes wholly unrelated to national security, and exploited secrecy mechanisms to

conceal their conduct and frustrate redress.

Constitutional Violations (Bivens/§ 1983).

a.     Fourth Amendment: Defendants conducted warrantless entries into plaintiff's home and vehicle and accessed her communications and financial records without a warrant or any valid exception;

b.     First Amendment: defendants retaliated against plaintiff for protected speech and petitioning activity on matters of public concern;

c.     Fifth/Fourteenth Amendments (Due Process/Equal Protection): defendants deprived plaintiff of due process by using clandestine processes to block meaningful notice and opportunity to be heard and selectively targeted plaintiff with malicious, discriminatory treatment;

275.     Extreme and outrageous course of conduct. Acting individually and in concert, defendants intentionally and/or with reckless disregard for the near certainty of harm engaged in a sustained campaign that included, inter alia: (a) persistent stalking and surveillance on and off duty; (b) interstate stalking; (c) false accusations to retailers that plaintiff was a shoplifter; (d) attempts to procure secret recordings of plaintiff's counseling sessions; (e) attempted and/or surreptitious entries into plaintiff's home; (f) interference with, deletion, and destruction of home-security footage and data; (g) tampering with mail and packages; (h) disseminating false information to banks, airports, airlines, and other agencies; (i) weaponized misuse of departmental processes, integrity tests, and disciplinary tools; (j) coercion and intimidation of third parties to withhold evidence; and (k) false statements to financial institutions that plaintiff was under investigation for financial crimes;

276.     Intentional Infliction of Emotional Distress (IIED). Defendants' conduct was extreme and outrageous, undertaken intentionally or with reckless disregard of the substantial probability of causing severe emotional distress, and in fact caused Plaintiff severe emotional distress, including anxiety, fear for personal safety, humiliation, sleep disturbance, and physical manifestations (including hypertension), for which she sought counseling and treatment;

277.     Invasion of Privacy — Intrusion Upon Seclusion (pled in the alternative where cognizable). Defendants intentionally intruded, physically and electronically, upon plaintiff's solitude, seclusion, and private affairs, including: (a) removal/destruction of home-security data and SD cards; (b) covert surveillance in and around her residence; and (c) efforts to obtain secret recordings of counseling sessions. These intrusions would be **highly offensive to a reasonable person** and lacked consent or lawful justification, proximately causing damages;

278.     Defamation (including Per Se). Defendants published to multiple third parties false statements of fact concerning plaintiff, orally and in writing, through in-person communications, electronic messages, inter-agency channels, and other means. Such statements falsely imputed criminality and professional unfitness, constituting defamation per se. The publications were made with actual malice and/or at least negligence, were not privileged (or any qualified

privilege was abused by malice), and proximately caused presumed, general, and special damages, including reputational harm, interference with banking access, disruption of travel, and impairment of prospective employment opportunities;

279.    Hostile Work Environment / Constructive Discharge (remedial and damages theory). Defendants subjected plaintiff to a retaliatory and hostile work environment— including micromanagement, public humiliation, disproportionate workload, denial of resources/equipment, pretextual integrity tests, and weaponized investigatory/disciplinary processes—so severe or pervasive as to alter the terms and conditions of employment. Supervisors knew, should have known, and/or directly participated or ratified the misconduct. The resulting conditions left Plaintiff no reasonable alternative but to retire, constituting a constructive discharge and a proximate cause of lost income and benefits;

280.    Causation and Damages. Defendants' conduct was a direct and proximate cause of Plaintiff's injuries, including severe emotional distress, reputational harm, economic losses (lost earnings/benefits), special damages (banking access interference, travel disruptions, lost opportunities), and other consequential and punitive damages as permitted by law;

281.    Punitive Damages. Defendants acted willfully, with spite, ill will, and reckless disregard for the truth and for Plaintiff's rights, warranting an award of punitive damages against the Individual Defendants where permitted by law;

282.    Preservation/Exhaustion/Alternatives. To the extent required, plaintiff has satisfied or is excused from any administrative prerequisites. Claims herein are pled in the alternative and should be construed to afford the broadest possible relief consistent with Bivens, § 1983, and state law; injunctive and declaratory relief are sought as appropriate to halt ongoing constitutional and tortious conduct.

**WHEREFORE**, Plaintiff demands judgment against the Individual Defendants (and against the City under Monell as separately pled) as follows: (i) compensatory damages in an amount to be determined at trial; (ii) presumed and special damages on the defamation claim; (iii) punitive damages against the Individual defendants where permitted by law; (iv) back pay, front pay, and loss of benefits associated with constructive discharge; (v) declaratory and injunctive relief to cease unlawful surveillance, record-tampering, and dissemination of false statements and to effect retraction/correction where appropriate; (vi) reasonable mitigation fees and costs under 42 U.S.C. § 1988 for § 1983 components; and (vii) such other and further relief as the Court deems just and proper.

### SEVENTH CAUSE OF ACTION: FIRST AMENDMENT VIOLATION

(Against All Individual Defendants under § 1983; against the City as separately pled under § 1983; conspiracy pled under § 1985 in the alternative)